Good morning, and may it please the Court. My name is David Goodknight for the two Qwest appellants. I'd like to reserve, if I might, Your Honor, two minutes for rebuttal and would like to share three minutes with Mr. Butler for TWT. We would like to withdraw that portion of our appeal in light of Sprint Telephony dealing with the non-fee and non-in-kind challenges, and those would be set forth, those provisions on pages 26-30, subsections 1-6 of our opening brief. As Your Honor knows, we've made a request for supplemental briefing, and in light of Sprint, would like to address the issue particularly of in-kind contributions in a supplemental brief, and if the Court permits that, we would like to withdraw that portion of our appeal. When did you file your request for supplemental briefing? Several months ago, Your Honor. As the Court knows from the record, the City of Portland's practice of requiring telecommunications companies to donate conduit and fiber to the city in exchange for use of the city's streets is not something new or isolated. It is a long-term practice designed intentionally to help the city build the Ernie network at a reduced cost. The contributions are very substantial. Thirteen different companies have been required to make these contributions, totaling to date over at least 58 miles of conduit and fiber in the expensive downtown corridor. The record shows, and the trial court found, that at least 10 percent of Ernie's physical infrastructure network today came through these free donations, and these donations of in-kind facilities, fiber and conduit, are not offset against any franchise fees. They're on top of the franchise fees that are required by the city, and they vary dramatically from provider to provider. The record contains several different lists of companies that have made these contributions. In some cases, it's hundreds of thousands of feet of conduit and fiber. Now the effect of this, obviously, is that it lowers Ernie's capital costs because it's not paying for infrastructure in the City of Portland. For some of that infrastructure What's the standard to determine whether or not these run afoul of the Telecommunications Act? What's our standard? Your Honor, the standard historically in the City of Auburn Well, we're in the world of sprint telephony now, so what's our standard? I believe the standard ought to be that a city that wants to require a free contribution of conduit and fiber has gone beyond its role in managing the rights of this. What does our case authority, I understand that your position is that that's what it ought to be, but what does sprint telephony say about when these demands run afoul of the Telecommunications Act? Sprint telephony doesn't address the issue. Sprint telephony was a facial challenge to the City of Auburn. It certainly doesn't deal with the question of What does the Telecommunications Act say then? Is your argument that these fees are preempted by the Telecommunications Act or that they run afoul? Yes. Okay, so what portion of the Telecommunications Act are you alleging has been infringed by these requirements? Judge Rawlinson, it would be 253A, that when a city requires a donation of conduit and fiber, millions of dollars, that has the effect of prohibiting the provision of service. That just doesn't meet sprint telephony's standard. It just doesn't do it. I believe it does, Your Honor. If the evidence shows that that contribution of conduit and fiber on the facts of the case, not a facial challenge, but the contribution of that conduit and fiber, has the effect, as the trial court noted that it does in this case, of lowering, artificially lowering, Ernie's price. But that doesn't prohibit, that doesn't have the effect of prohibiting your client from providing the services. How do you meet that? Well, our argument would be, Your Honor, that if Quest and Ernie are competing for a client, and Quest has to pay for its own conduit and fiber, and also has to make, in this case, QCC made a $900,000 donation on top of its franchise fee that Ernie's using, Quest costs, capital costs, and prices are increased, and Ernie's prices are decreased. That's competition, but it doesn't have the effect of prohibiting you from providing the service. If your company was going out of business or wasn't able to service its customers, I could understand your argument, but that's not the fact. Those are not the facts of this case. Well, the courts have held in the Second Circuit, the Tenth Circuit, and this circuit, that a literal prohibition, an inability to do business, is certainly not required. The language of A says any law, regulation, or legal requirement that has the effect of prohibiting the provision of any service, any telecommunications service, and if Quest can't compete because Ernie's prices are artificially, and the record shows, 20 to 50 percent lower due to these contributions. But Quest is competing. That's the difficulty I have with your argument, is that Quest is competing in the marketplace. Well, it's trying to, Your Honor, but you can't compete on a level playing field. If one party can go to your customer and say, due to these free facilities, we can undercut Quest by 20 to 50 percent. And so the record shows that Quest has lost five substantial customers. Five customers? Five customers, totaling 11 percent of its revenue in this market. What the trial court held in the standard, to answer your question, Judge Rawlinson, that the trial court applied, is found on pages 1105 and 1096 of the opinion. And the trial court actually held, on page 1105, that regardless of how much in-kind contributions lower Ernie's prices, Quest has not shown that Ernie's prices may have the effect of prohibiting the provision of service. So even if the free facilities lower Ernie's prices by 50 percent, and realistically in the market, Quest can't be a company that's getting that kind of advantage. The trial court held that is not an effective prohibition. And then the court established this test at page 1096 of the opinion. The court said, I accept the testimony of the city's expert who stated that Ernie is not significant in the Portland market, has no market monopoly power, no opportunity to monopolize or predatory price. That's antitrust language, right? That's exactly right, Your Honor. And that is the error of the standard set by the trial court, to say, in essence, unless and until these donations are such that Ernie, which the court described as being not big enough on page 1096, that Ernie becomes a monopolistic provider and can predatory price, unless that happens, there can't be an effective prohibition. But we're looking at this de novo, so. That's right. The standard that was used by the district court doesn't govern our review of it. We have to look at it in terms of de novo review under the Telecommunications Act. Exactly right. And one case, Your Honor, that I think is instructive from the Second Circuit on this issue, the issue really is, if one provider, because of the city's regulatory regime, not because of competition, but because of Portland's capital structure advantage that lowers prices, can that be an effective prohibition? What's the effect of subsections B and C? Well, subsection C, the safe harbor, the city would have to show that its pricing scheme and its in-kind contribution scheme is competitively neutral and fair and reasonable compensation for use of the rights-of-way. And the record in this case is very clear that these in-kind contributions are really a ticket to do business. They're not connected to the franchise fees. They're not offset. And they're not rationally related to use of the rights-of-way. What case says they have to be connected to the franchise fees? Well, the case that addressed that issue that speculated that in-kind contributions could sometimes be allowed, which frankly is a bit of an outlier on that issue, is the Second Circuit. And the Second Circuit said, if a city is requiring in-kind contributions of conduit and fiber and the franchise fee provisions are otherwise fair and reasonable, and if that contribution is offset from the fees, that could pass muster. Now, the Second Circuit struck down that regulatory regime. What were the in-kind provisions specific to Quest in this case? The in-kind provision, Your Honor, was conduit worth $900,000 that was required of QCC. When? At the time they entered the franchise. It's set forth in, I believe, Section 9.1 of the QCC. So it's not a continuing obligation? No. And as to QCC, it's a one-time obligation set forth in the franchise agreement. As to TWT... Oh, we're talking about... You're arguing right now... Yes. ...about the in-kind obligation that was imposed at the time services commenced, right? Correct. And it's not an ongoing obligation? Correct. It's set forth in the franchise agreement. At approximately $900,000 is the capital value of that contribution on top of the franchise fee. And that was 12 years ago, is that right? The QCC franchise agreement is 180D at page 1, dated 1997, correct? Let me ask you one question. At the time this case was tried, obviously, the trial court didn't have the benefit of our opinion in telephony. Now that we know, now that the court has decided what 253 means, the prohibition clause, the effective prohibition clause mean, is there anything you would have done different at the trial? In the trial court? On the in-kind issue, I do not believe so, Your Honor. This is the record. I believe that's correct. I believe on that issue, and that's why we would ask for relief that the court conclude that the trial court's standard, monopoly standard equating with effective prohibition is erroneous as a matter of law and reverse and vacate the judgment of the trial court. So given the extensive nature of the in-kind contributions, the record on the effect on pricing and the loss of costs of the in-kind contributions. And then you'd want us to say that as a matter of law, you're entitled, you've shown that there's been an effective. No, Your Honor. I would say that on the record in this case, where the pricing has been, the pricing of Ernie has been reduced by 20 to 50 percent because of these in-kind contributions, where we know that they're valued in the millions of dollars, that they are not offset against franchise fees. There's nothing for the trial court to do on remand. This court on that record can say, that is unlawful. As a matter of law, so you're asking us. No, on the record. The test, I think, would be as a matter of law. Right. But the judgment would be on the undisputed facts in the record. Counsel, you addressed 253C, but you didn't address 253B. On the setup. We don't think it applies, Your Honor, because we're dealing with local regulations. The final point I'd like to make. Well, you're saying it's not a state, it's not the equivalent of a state. Exactly right. The final point I'd like to make is that the courts have held, and this court has held, that in evaluating these challenges, you have to consider all of the challenged local laws in combination. And we also have a scheme here where franchise providers are paying 5% of gross revenues defined as all revenues less net uncollectibles, where Ernie is paying 5% on only 10% of its million dollars of revenue. So Ernie's franchise fee, unlike everyone else's, on a million plus in revenue, was $4,000. That implicates the Tax Injunction Act that we didn't even address. When was the competitor franchised? I'm sorry, Your Honor? That were treated unfairly. And my question is, your competitor, when did it get authorization to do what it does? Ernie got the authorization. It is a SELAC authorized by the state commission, and the city of Portland has simply been donating these facilities to Ernie and giving it this favorable definition of gross revenue. But don't they have authorization in the city as well? Not when they violate the provisions of the Act, Your Honor. I think the preemptive scope of 253 would prevent that. Well, we're not tracking. Did Portland ever authorize your competitor to operate in the city? I believe the commission, the state commission, authorized Ernie as a SELAC. The city of Portland did not. Ernie does have a franchise agreement, yes. Okay. Now my question is, when? When did they start? I don't recall, Your Honor, the precise date that they started. Was it before your franchise? I don't believe so. Okay. You had wanted to, was it TWT?  I'll give you a few minutes. Mr. Thatcher kindly provided the language about which I want to talk. I really want to address just the contract issue that's unique to TW Telecom.  The issue of the trial courts holding that TW Telecom was required to pay franchise fees on its information and co-location services. And this issue really comes down to interpretation of the language of the franchise, and specifically two sections, which is C and D of the franchise, which talk about or define telecommunications on which we're supposed to pay gross revenue. These in terms of connecting or interconnecting entities for the purpose of transmission of voice data or video. Your argument is those are not telecommunication services? That's correct. And it is our argument that they are not covered by those sections, because those sections we believe, first of all, relate only to the interconnection of networks of carriers. But the trial court said, no, the term interconnection, notwithstanding the fact that the FCC has defined interconnection in terms of the joining of two networks for the purpose of mutual exchange of traffic. We said that it can also apply to end users. Our position is that doesn't get you there, because the definition still talk about services being those which connect entities. It does not say that it includes transmission services. And that's really what's involved here. That's what's provided to end users is transmission services. And just like the FCC's definition, which says that interconnection includes the joining together of networks for mutual exchange of traffic here, connection or interconnection for the purpose of transmission, does not include the transmission. Transmission services, if they're to be covered, would have to fall under subsection F, which is other telecommunication services authorized by the FCC or the Oregon Public Utility Commission. But neither the FCC nor the Oregon Public Utility Commission considers information services or co-location services to be telecommunication services. So our argument is they're not covered. We don't have to pay franchise fees on them. Co-location services are simply the rental of space, provision of heating, ventilation and air conditioning and security services. They don't involve connection. They don't involve transmission. While there is a connection from a co-location space, which is space in Time Warner's own office, that is provided as part of the transmission services which are provided to end users and the telecommunication services that we provide, we pay franchise fees on those connections. So the argument you just made, how does this all involve a 253 claim? I'm sorry, Your Honor, 253 with respect to this? Yes. This is not a 253 issue. This is purely a contract interpretation issue. So it's just a challenge to the terms of the contract? Yes, that's correct. That's it? This particular issue, that's all that is. I see. Thank you. Okay. Appeal to the Court. Good morning, Your Honors. I'm Terrence Thatcher. I'm the Deputy City Attorney for the City of Portland. I'm appearing here for the City of Portland. I brought your chart because I think you needed it. I know you know that, but it helps me remind myself how to split these issues up. The first issue is the city's cross-appeal. Judge Panner invalidated an in-kind compensation provision, the Time Warner provision, because he said that it may prohibit Time Warner from providing services. He applied the Auburn test. And it was a provision that he said granted the city too much discretion. It's the city's position that that decision needs to be reversed. Judge Panner applied the wrong test, and he came to the wrong conclusion. Well, he didn't have the benefits of our en banc opinion. Yes, Your Honor. Now, Time Warner has appealed all these things. He has now dropped the non-key franchise provisions. We haven't talked about the franchise provisions here. I can't talk about them, if you wish. I would prefer instead, unless you have questions about those, to talk about the in-kind provision, since that's what Mr. Goodnight relied on. At some point, I would like someone to address the Tax Injunction Act. I will, Your Honor, then. Absolutely. And then the last issue, just to explain the state law issue that Mr. Butler just raised, the city – when the city was sued, the city realized that one of the people suing it, Time Warner, had not been paying all the franchise fees that it was required to do, at least under our interpretation of the contract. Time Warner said, oh, no, no, no, no, no. You have this really complicated definition here that was negotiated and has been used by the City of Portland over all these years, but we really think that you should be applying essentially a Federal definition test. That's what Mr. Butler was just talking about. So we basically counterclaimed for back franchise fees. Time Warner said, no, we don't owe you those fees. This was the one issue that went to trial before Judge Panner. He had findings of fact. He had conclusions of law. And he determined – and Mr. Butler has never challenged the – on a clearly erroneous test. He determined, as a matter of fact, that the parties didn't intend to rely on Federal definitions. So that's really a trial issue. I'll talk about it if you have questions relating to Mr. Butler. Now, let me turn first, then, to Judge Rawlinson's question about the Tax Injunction Act.     I'm not going to go into detail on that, but I would like to respond to Mr. Goodnight's comments, if I may, on the in kind. And may I say, Your Honors, I've been doing this for a long time. It's right here. I have to say that Mr. Goodnight's chronic and egregious misrepresentation of the record exceeds nearly any bounds that I have ever seen before this Court or maybe any other. We've laid all this out in our brief. But he refuses to understand that this is a case on summary judgment, that if he puts in some factoid and a judge determines it isn't disputed or it isn't even fact, he can't show up here in this Court and say, oh, here's something that I found in the record. Could you give us specifics? He says that there are hundreds of thousands of feet of conduit that have been provided by particular providers, not these two providers. And, in fact, I'd written him a letter on that and said, please don't ever say that again. You keep citing the wrong numbers. Here's the evidence. He says that the Ernie facilities lowered Ernie's costs by millions of dollars. That's based on estimates of what Ernie cost, our telecommunications system cost. Estimates before we built it. The evidence in the case is that the city spent $11 million building this system and that the in-kind conduit is worth less than one-half of 1% of the value of Ernie. We are the competitive juggernaut. Ernie, we have six customers. We serve police departments and schools. You know, the city of Portland has been told for years we should act more like a business. We should be smart about this stuff. And we actually took advantage of that advice. And we put together a little telecommunications system that provides low-cost, high-speed Internet to every kid in this school. And we're proud of it. And these companies want to tear it apart so they can require the schools to buy high-cost, low-speed Internet service. That isn't what this act is about. But let me, let me, let me mention, Time Warner has never given any conduit to the city under that franchise provision. This is a pure facial challenge. Under sprint telephony, Time Warner's conduit franchise provision cannot be preempted. QCC, Quest Communications, has never given conduit to the city because it doesn't have that requirement in its permit. QCC, 12 years ago, did not give, but in exchange for value, the right to use city streets. QCC gave the city a couple of miles of two two-inch conduits. Now, they say it costs $900,000, but in fact, it was just an add-on for them. It's probably $3 a foot. That was 12 years ago. And QCC's conduit is not used by Ernie. It's used by the city to run traffic signals. There is no one in this case whose conduit has been used by Ernie. And in the district court, these parties were invited to name as indispensable parties all the other franchisees that aren't here complaining about their in-kind conduit, the ones that Ernie uses, and they declined to name those parties. The other parties that are not here complain about their in-kind conduit, the ones that Ernie uses, and they declined to name those parties. The other parties that are not here complain about their in-kind conduit, the ones that Ernie uses, and they declined to name those parties. Just as a pure procedural matter, Your Honors, these parties have no right to challenge the contracts that the city has with other parties that are not even in court. In addition, I must say that the record that Judge Panner reviewed was that whatever this in-kind conduit with regard to other parties does, it hasn't significantly lowered Ernie's costs. As a matter of fact, the millions of dollars Mr. Goodnight mentions are, as I said, estimates. The city invested $11 million and a few thousand feet of in-kind conduit. The judge did not apply some improper antitrust case. The judge was trying to figure out if what the city did prohibited anybody from entering the market. And what he concluded was they're all in the market. Competition is not a prohibition. The city has one advantage. The city owns the rights of way. We can't raise money with stock. We can't go to Wall Street. Everything we do has to be open and above board. We can't have private meetings. But we own the streets. That's the only advantage the city is taking. If we want to compare apples and apples, Time Warner bought 50 miles of system from bankrupt Enron. This is in the record from bankrupt Enron for $750,000. That's about $15,000 a foot. Excuse me, a mile. Enron and Ernie system cost it $120,000 a mile. This is competition. Some people have some advantages, some have others. This is not prohibition. Finally, tax injunction. There were two fees involved here. There was a 5% fee imposed on Time Warner. They can go anywhere in the city they want. They have ubiquitous access to the rights of way. And electric utilities and gas utilities and telecommunication utilities, cooling districts, people that have for decades, people that have that kind of access to the city rights of way have always paid 5%. It's not just telecoms. QCC, the other plaintiff in this case, pays a perfect fee because they only wanted a couple of miles of street use. So the city has a lower rate for them. They said, we just want a little piece. We said, okay, we're not going to take 5% of your revenues. Judge Panner, in an attack on the 5% franchise fee, Judge Panner said, under the surprise case applying BIDORT, I can't look at that. It doesn't mean it can't be challenged. These parties can go to state court. It's critically important. And I think we all remember we are not denying anybody a right to court review. There's an adequate remedy in state court for a challenge. Absolutely. And the judge found that. And there have been cases brought in state court challenging telecommunications franchises. There's a very important case, a case out of Eugene that went all the way to Supreme Court on 253 issues. So there is a remedy. So the judge said that 5% franchise fee looks like what the surprise case says I can't get into. It goes into the general fund. It's a fee that's applied to gas companies, electric companies, telecom companies. It's broadly based. Anyone else? I mean, is it gas? You said gas companies. Telephone companies, you said? Telecommunications. Telecommunications. And what else? What other? Electric companies. We have a heating and cooling district. Basically people that use the streets. And it's imposed by the city council, which is a legislative act. So it fits all the BIDER tests. And it exactly fits into the surprise analysis because in the surprise case, the court actually, the Ninth Circuit, took a bunch of franchise fee cases and said, here are some examples of things that are taxes under the TIA. And there were three franchise fee cases, one from the Third Circuit, one from, I'm sorry, I can't remember the other two circuits, and one from a district court. So Judge Panner didn't do anything wrong here. Judge Panner just followed the clear reasoning of surprise. What's left? And I would urge, now, Judge Panner upheld the city's franchise fee on both carriers, the per foot and the 5%. He did that, as you said, even if it isn't protected by the Tax Injunction Act, I don't think, through the prohibition. And these parties have never shown that that 5% fee that is charged to just about anybody who uses the city streets is a prohibition. This Court has never dealt with the issue of how you decide prohibition where there's an economic burden placed on a carrier. But these carriers and all the others are operating, and I would say they haven't shown a prohibition. The alternative, if you feel the need to look at that, would be to look at the FCC decisions, particularly the California payphone decision that was referenced in the Sprint case. And there the FCC said if there's an economic burden placed on a carrier, the way you find out if that is an effective prohibition, because we'd be the first to admit if we basically said to the companies, you have to pay us 100% of all your money that you earn in the city of Portland, they probably wouldn't enter the market. But the 5% fee doesn't do that. And the FCC has said that the way you determine what kind of economic burden is over would be prohibitive. That's found in the California payphone case. And they basically say that, very similar to what Judge Rawlinson was saying, if the company can show that the economic burden is so much that they just – if the company can show that the economic burden is so much that they just can't simply operate at all, that's a prohibition. That's what the FCC says. As a practical matter, these fees are passed on to the customers. I know when I get my bill, I see a lot of fees. Absolutely, Your Honor. Absolutely, Your Honor. And so Time Warner and everybody else passes that 5% fee on to everyone. They make their money and they add that on. I want to emphasize that although Judge Panner reached the issues of 253B and 253C and we think he decided those issues properly, under this Sprint test, you don't even need to go there. There isn't a prohibition here. But I would urge you, given Judge Panner's application of the Auburn case, the city deserves reversal of this facial invalidation of an in-kind compensation provision that has never been applied. If we were to agree with you, does that need to go back to district court? Your Honor, I think as a matter of law, you can say Time Warner is – no, it does not. You can say as a matter of law, this is reversed. Just for the record, I'm not a customer of any of the people who are in this court. I just wanted to make that clear. I understand. My time has run out. If you have no more questions, I will sit down and let Mr. Goodenight proceed. Judge Jenkins, the Ernie franchise is found in the record at 380D and the date was 2003, March 26th. The Ernie franchise is found in the record at 380D at page 61. In terms of the grants of in-kind contributions, the record at SER 344 and 345 list those grants, list the grantors and the number of feet of duct or fiber. Also at 12QER at page 83, the court will find 16 different grants of in-kind facilities. And at SER 344 is where the number 58 miles come from. On the Tax Injunction Act, Your Honor, you may recall I was counsel in the Tucson case and the Berkeley case. And as the court may recall, in that case, the two fees at issue under the Tax Injunction Act analysis were an ordinance that provided a 1.5 and 2 percent fee that the state court had determined in its highest state court was a transaction-privileged tax. The trial court gave that collateral estoppel effect, and this court noted that in its opinion. Historically, a fee in exchange for a benefit, the right to use the right-of-way, is not considered a tax under the. Do with City of Surprise. Well, City of Surprise, Your Honor, as I indicated, did not involve a franchise fee. The franchise fee, as the opinion itself notes, was mooted out by the city prior to the decision of the district court. The city withdrew the application of the franchise ordinance as to Quest Corporation in that case. So all that was left were the 1.5 and 2 percent transaction-privileged taxes. Now, the language of the opinion, I acknowledge, is broader in some of the citations than that would suggest. But the posture of the case is that the only two fees were transaction-privileged taxes. But even if you applied the BIDART factors, how do we avoid a finding that this is a tax? Well, our position, Your Honor, would be that where the fee is in exchange for a benefit, the right to use the right-of-way, as it is, for example, with QCC paying 263 a foot for Portland, the court said that's not a tax. No, I'm talking about the franchise fee, not in exchange, not the conduit, the in-kind. I'm talking about just the flat-out franchise fee. But you're saying that's in exchange for using the streets? Right. And, well, that's what the franchise agreements say. Indeed, that's what the city said in the record. And the $2.63 fee in the QCC franchise agreement is the franchise fee. Well, let me ask you this, then. What case most strongly supports your argument that if you are paying in exchange for the use of the street, that's not a tax? I'll give you several, Your Honor. Just give me your strongest. The Carmichael case from the U.S. Supreme Court, Judge Ilston's opinion in Berkeley at the trial court level, finding the Tax Injunction Act does not apply. Well, I'm not persuaded by a district court case. So if you could give me a case that's a circuit court case or a Supreme Court case. So you're saying Carmichael? Yeah. And I would also say this Court's opinion in the city of Berkeley issued by Judge Trott on the same day that Tucson was issued struck down non-cost-based fees for use of the right-of-way. The Court didn't say the Tax Injunction Act bars this. I don't think it was raised. No, they were struck down. If I remember correctly. Yeah. I would submit that they were struck down. The opinion references that. I know I've exceeded my time, Your Honor. Yes. But thank you very much. Thank you. All right. The matter will be submitted. Thank you. Counsel, before you leave, was the Carmichael case cited in your brief? Yes, it was. Okay. Thank you. Our next case is at MCI Communications Services v. City of Eugene. Thank you.
judges: Paez, Rawlinson, Jenkins